1999-NMCA-084

984 P.2d 760

**Paul DUNN, Plaintiff–Appellant,**

v.

**Patricia McFEELEY, M.D., State of New Mexico, Office of the Medical Investigator, Larry Warehime, State of New Mexico, Department of Public Safety, State Crime Laboratory, Noe Galvan, and the New Mexico State Police, Defendants–Appellees.**

No. 18,459.

Court of Appeals of New Mexico.

April 28, 1999.

Certiorari Denied June 16, 1999.

Victor A. Titus, Titus & Murphy, Farmington, for Appellant.

Mark D. Jarmie, Ned S. Fuller, Sharp, Jarmie & Scholl, P.A., Albuquerque, for Defendants–Appellees.

## OPINION

HARTZ, Judge.

{1}   On April 4, 1994, Plaintiff's wife, Monica Dunn, died of a gunshot wound to the abdomen.  Plaintiff was charged with murder.  On December 12, 1994, a jury acquitted him of the offense.  He then sued various State agencies and their employees who had been involved in the investigation of the death: Dr. Patricia McFeeley and her employer, the New Mexico Office of the Medical Investigator (OMI);  Larry E. Warehime and his employer, the State Police Crime Laboratory (the Laboratory);  and Noe Galvan and his employer, the New Mexico State Police. We will refer to the people being sued as the Individual Defendants and their employers as the Agency Defendants.  Plaintiff alleged that improper investigation by Defendants resulted in his wrongful prosecution.  His complaint raised civil rights claims under 42 U.S.C. § 1983 (1994), and tort claims under the New Mexico Tort Claims Act, NMSA 1978 §§ 41–4–1 to –29 (1976, as amended through 1994).

{2}   The district court dismissed all the claims.  Plaintiff challenges the dismissal of the civil rights claims against the Individual

Defendants in their individual capacities and the dismissal of the tort claims against McFeeley, Warehime, and their employers. The issue on appeal with respect to § 1983 is whether the Individual Defendants were entitled to qualified immunity on the ground that their alleged misconduct had not been "clearly established" in 1994 to be contrary to the federally protected rights of Plaintiff. The issue under the Tort Claims Act is whether McFeeley, Warehime, and their employers were "law enforcement officers" within the definition of the term in the Tort Claims Act. *See* § 41–4–3(D) (defining "law enforcement officer"). We reverse the dismissal of the civil rights claims but affirm the dismissal of the tort claims.

### I. *Procedural Background*

{3} Plaintiff filed his original complaint on April 3, 1996. Defendants removed the case to federal district court. Deciding that it lacked subject matter jurisdiction over a number of the claims, the federal district court remanded the matter back to state court on October 22, 1996.

{4} On December 4, 1996, Defendants moved under Rule 1–012(B)(6) NMRA 1999 to dismiss the § 1983 claims for failure to state a claim upon which relief could be granted. They argued that § 1983 does not permit claims against government agencies or government employees in their official capacities. As for the § 1983 claims against the Individual Defendants in their individual capacities, they argued that negligence in investigating a crime could not form the basis of a § 1983 claim and all that was alleged in the complaint was that they had been negligent.

{5} On the same date Defendants also filed a motion under Rule 1–012(B)(6) to dismiss the tort claims. McFeeley, the OMI, Warehime, and the Laboratory contended that they were entitled to the general immunity from tort liability provided by Section 41–4–4(A) to "[a] governmental entity and any public employee while acting within the scope of duty." Although Section 41–4–12 waives immunity for law enforcement officers in certain circumstances, these Defendants asserted that they were not law enforcement officers.

{6} In response to the motion to dismiss the § 1983 claims, Plaintiff did not oppose dismissal of the claims against the Agency Defendants or the claims against the Individual Defendants in their official capacities. He did, however, contest the motion to dismiss the claims against the Individual Defendants in their individual capacities. He attached to his response almost 400 pages of documents (the Attachments) "[t]o allow the Court to focus on the particular facts of this case to make this decision." Plaintiff apparently obtained the Attachments during the criminal proceedings. In response to the motion to dismiss the state tort claims, Plaintiff argued that Defendants were part of the law enforcement team and therefore were law enforcement officers.

{7} After hearing arguments by counsel on the motions, the state district court dismissed with prejudice the § 1983 claims against the Agency Defendants and the Individual Defendants in their official capacities; dismissed the § 1983 claims against the Individual Defendants in their individual capacities, but with leave for Plaintiff to file an amended complaint on those claims by February 8, 1997; and dismissed with prejudice the state tort claims against McFeeley, the OMI, Warehime, and the Laboratory. The court took under advisement the motion to dismiss the state tort claims against Galvan and the State Police.

{8} Plaintiff filed his amended complaint on February 7, 1997. Among the allegations against the Individual Defendants were the following:

Against McFeeley:

32. In performance of the autopsy of Monica Dunn and formulating opinions and issuing office reports herein, McFeeley so failed to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified doctors of the same field of medicine and specialization as that of McFeeley such that her conduct was grossly incompetent and purposefully reckless and in disregard of the rights of Plaintiff.

. . . .

61. McFeeley was deliberately indifferent to the rights of Plaintiff in conducting autopsies and preparing autopsy reports and stating therein conclusions not based upon her findings, but those of others.

Against Warehime:

43. In performing his work at and for the Crime Lab, Wareheim [sic] failed to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified crime lab technicians of the same field and specialization as that of Wareheim [sic] practicing under similar circumstances such that he was grossly incompetent and purposefully reckless to be in willful disregard of the rights of Plaintiff.[ ]

. . . .

67. Wareheim [sic] was deliberately indifferent to the rights of Plaintiff in collecting evidence from crime scenes.

Against Galvan:

50. Beginning on April 4, 1994 and continuing until he filed his Affidavit for Arrest Warrant, Galvan collected evidence concerning Monica Dunn's death in such a manner that he failed to secure from Monica's family a suicide note delivered to them the day before she died which was not produced until ordered by the Court some seventy-five days later, as well as failing to properly collect, document and report physical evidence, witness statements, and polygraph evidence such that his conduct was so grossly incompetent and purposefully reckless to be in willful disregard of the rights of Plaintiff.

. . . .

57. Galvan knew or should have known that his actions would violate the constitutional rights of Plaintiff.

{9} Defendants answered the amended complaint and again filed a motion under Rule 1–012(B)(6) to dismiss the § 1983 claims against the Individual Defendants in their individual capacities. Plaintiff responded, again submitting the Attachments with his response. On April 11, 1997, the district court dismissed with prejudice the § 1983 claims against the Individual Defendants. To obtain a final, appealable order, Plaintiff acceded to dismissal without prejudice of the tort claims against Galvan and the State Police. An amended order including this dismissal was filed in district court on October 8, 1997.

**II.** *Standard of Review*

■ {10} Defendants moved under Rule 1–012(B)(6) to dismiss the complaint for failure to state a claim. "On such a motion the court considers whether Plaintiff is entitled to relief under any state of facts provable under the claim." *Stock v. Grantham*, 1998–NMCA–081, ¶ 24, 125 N.M. 564, 964 P.2d 125 (internal quotation marks and citation omitted).

{11} In certain circumstances, however, a motion to dismiss is converted into a motion for summary judgment. Rule 1–012(C) states:

If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 1–056, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 1–056.

*See GCM, Inc. v. Kentucky Central Life Ins. Co.*, 1997–NMSC–052, ¶ 11, 124 N.M. 186, 947 P.2d 143 ("Because exhibits and affidavits, matters outside the pleadings, were presented to the court and not excluded for purposes of the motion, the proper standard of review is under Rule 1–056 for summary judgment."); *Sanders v. Estate of Sanders*, 1996–NMCA–102, ¶ 7, 122 N.M. 468, 927 P.2d 23. "The standard of review for a motion for summary judgment is whether there are any genuine issues of material fact and whether the moving party is entitled to summary judgment as a matter of law." *Williams v. Central Consol. Sch. Dist.*, 1998–NMCA–006, ¶ 7, 124 N.M. 488, 952 P.2d 978.

■ {12} Here, Plaintiff submitted the Attachments with his responses to Defendants' motions to dismiss. By doing so, he might have converted the motions to dismiss into motions for summary judgment. But in our view no such conversion occurred.

{13} To say the least, Plaintiff's filing of the Attachments was an unusual tactic. Conversion from a motion to dismiss on the pleadings to a motion for summary judgment could rarely, if ever, benefit the party opposing the motion. As previously stated, a motion to dismiss loses if relief is available "under any state of facts provable under the claim." *Stock,* 1998–NMCA–081, ¶ 24, 125 N.M. 564, 964 P.2d 125. Conversion to a motion for summary judgment, however, can eliminate scenarios consistent with the pleadings but inconsistent with uncontradicted facts presented to the court for consideration of the summary judgment motion. The party opposing the motion is reined in. We can think of one reason why a plaintiff facing a motion to dismiss might wish to make a factual presentation to the court. If a plaintiff wishes to respond to the motion by seeking leave to amend the complaint, the plaintiff may wish to encourage the trial court to exercise its discretion in favor of permitting the amendment by establishing that there is a factual basis for the amendment. But we can see no incentive for a plaintiff opposing dismissal to try to convert the proceeding to a hearing on a motion for summary judgment.

{14} Hence, we would be reluctant to infer that Plaintiff's filing of the Attachments was an effort to convert the motion to dismiss into a motion for summary judgment. Furthermore, Plaintiff did not mislead Defendants or the court in this regard. Not only did Plaintiff never state that he was arguing a summary judgment motion, but also he made clear that he wished to pursue further discovery to support the allegations in the complaint. For example, during the hearing on the motion to dismiss the original complaint, Plaintiff's counsel stated:

I think that you will note that ... we basically pled that ... civil rights had been violated and we didn't specify and we asked that with the intent to try to look at what discovery was going to bring out in the case.

It's true, as [defense counsel] said, that [Plaintiff] went through a two week criminal trial in Gallup, New Mexico, December of 1994, after which he was acquitted, but the issues in that case certainly were different than the issues in this case and we were not allowed to discover nor were there ever any factual issues developed concerning some matters in this case that really give rise to the filing of a civil action .... So those are the issues that need to be fully, factually developed to determine whether in fact, a conspiracy to prosecute or a malicious prosecution in fact exists in this case.

Plaintiff's expression of a desire to conduct further discovery certainly conveyed to the court and Defendants that he did not feel prepared to withstand a motion for summary judgment at that time.

{15} More importantly, both the district court and defense counsel treated the matter as a motion to dismiss. At the outset of the hearing on the motion to dismiss the original complaint, the following exchange occurred:

THE COURT: I've read the briefs, but I haven't read all of the exhibits that the Respondents [sic] attached to their response.

[DEFENSE COUNSEL]: I'm not sure that's necessary in a motion to dismiss setting.

A later exchange went as follows:

[DEFENSE COUNSEL]: My understanding is as early as possible, the Court needs to make a determination as to whether there is legal sufficiency for the claim to go forward.

THE COURT: How can I even pass on the issue of qualified immunity based upon the pleadings in this case? If I just look at the pleadings I don't have the slightest idea what this case is about.

[DEFENSE COUNSEL]: Well, it's a question of law. The pleading, it's the Plaintiff's responsibility to plead a cause of action that would be sufficient under the law to go forward. He hasn't done that. I think he's admitted that he hasn't done that and at the very least we need to amend his pleading to add this conspiracy allegation. Second, I think we look at the facts that do exist to establish whether we need to amend the pleading and go through this whole process again.

{16} There is no reason to believe that Plaintiff's inclusion of the Attachments in his response to Defendants' motion to dismiss the amended complaint signified anything different to the court or Defendants than did inclusion of the same documents in his response to Defendants' initial motion to dismiss. Defendants moved to dismiss the amended complaint under Rule 1–012(B)(6) for failure to state a claim. They restricted their argument to the allegations of the amended complaint. They did not purport to rely on the Attachments. Plaintiff's response to the new motion gave the same explanation as before for the Attachments: "[t]o allow the Court to focus on the particular facts of this case to make this decision." At the hearing on the motion, the parties, relying on their briefs, made no additional arguments.

{17} We recognize that a motion to dismiss "shall be treated as one for summary judgment" when "matters outside the pleadings are presented to and not excluded by the court." Rule 1–012(C). The situation here fits the literal language of the Rule. The Attachments were "matters outside the pleadings" and they were "presented to and not excluded by the court." Nevertheless, we are confident that the court and the parties all treated the motion as simply a motion to dismiss. If the district court had indicated that it was treating the motion as one for summary judgment, it is clear from the record that Plaintiff would have objected and requested further time to pursue discovery. It would be unfair to Plaintiff to affirm the judgment below on the ground that the undisputed facts of record support summary judgment. In essence, we would be affirming the judgment on a ground not relied upon, or even pursued, below. Believing that such action would be inappropriate in the present circumstances, we do not take that course. *See Rupp v. Hurley,* 1999–NMCA–057, ¶ 25, 127 N.M. 222, 979 P.2d 733 (Ct. App. 1999) ("Only rarely will it be fair to affirm on a ground that was not raised in the lower court.").

**III.** *Section 1983 Claims*

{18} Section 1983 subjects to liability a person acting under color of state law who violates rights of the plaintiff created by the United States Constitution or federal statutes. *See Moongate Water Co. v. State,* 120 N.M. 399, 403–04, 902 P.2d 554, 558–59 (Ct.App.1995). Such a person, however, is entitled to qualified immunity from suit unless at the time of the alleged misconduct it was "clearly established" that the misconduct violated federal law. *See Yount v. Millington,* 117 N.M. 95, 98, 869 P.2d 283, 286 (Ct.App.1993). "[A] legal point is clearly established for the purpose of defeating qualified immunity when it has been decided by either the highest state court where the cause of action arose, by a United States court of appeals, or by the United States Supreme Court." *Id.* at 101, 869 P.2d at 289. Although there may be circumstances in which the law is clearly established despite the absence of a case in point, *see K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990), we need not explore the full scope of the matter to decide the appeal before us.

{19} To determine whether Defendants were entitled to qualified immunity, we must examine what was "clearly established" in 1994 when the alleged misconduct occurred. In *Robinson v. Maruffi,* 895 F.2d 649, 655 (10th Cir.1990), a case arising in New Mexico, the court held that the defendants could be liable if they "purposefully concealed and misrepresented material facts to the district attorney which may have influenced his decision to prosecute Robinson." Five years earlier, in *Anthony v. Baker,* 767 F.2d 657 (10th Cir.1985), the court had held that state officials could be liable under § 1983 for conspiring "to procure groundless state indictments and charges based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction." *Id.* at 662. Our opinion in *Yount,* 117 N.M. at 98, 869 P.2d at 286, said: "It was well established in 1985 that the intentional falsification or reckless disregard for truthfulness regarding material facts in an affidavit to support probable cause for issuance of a search warrant violates Fourth Amendment rights."

{20} As we read Plaintiff's amended complaint, it encompasses allegations that the Individual Defendants acted recklessly and with willful disregard of Plaintiff's rights in providing inaccurate information that contributed to the arrest, prosecution, and incarceration of Plaintiff. Although Plaintiff's counsel appeared to concede at the district court hearing on the initial motion to dismiss that he could not prove such allegations, he expressed his belief that there were sufficient suspicious circumstances to warrant pursuing discovery that might establish their truth. The issue before us is whether the allegations could support a cause of action under § 1983. In our view, they could. Thus, dismissal for failure to state a claim was error.

{21} Therefore, we reverse the dismissal of the § 1983 claims against McFeeley, Warehime, and Galvan in their individual capacities, and remand to the district court for further proceedings.

## IV. *State Tort Claims*

{22} The Tort Claims Act grants immunity from tort liability to governmental entities and public employees acting within the scope of duty except as waived by specific provisions of the Act. *See* § 41–4–4(A). Plaintiff relies on the waiver in Section 41–4–12 for certain torts "caused by law enforcement officers while acting within the scope of their duties." Section 41–4–3(D) defines a "law enforcement officer" as

> any full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor.

Although, there is no dispute that Galvan was a law enforcement officer, Plaintiff stipulated to dismissal without prejudice of the tort claims against him and the State Police. We therefore address only whether McFeeley, Warehime, and their employers come within the definition of "law enforcement officers."

{23} To begin our analysis, we observe that the Agency Defendants do not come within the definition of "law enforcement officer" because an agency could not be a "full-time salaried public employee." (An agency may, however, be liable for the misconduct of an employee who is a law enforcement officer. *See California First Bank v. State*, 111 N.M. 64, 68–69, 801 P.2d 646, 650–51 (1990).) Thus, we turn our attention to McFeeley and Warehime, starting with McFeeley.

{24} McFeeley is a physician employed as a medical investigator by the OMI. In *Begay v. State*, 104 N.M. 483, 487, 723 P.2d 252, 256 (Ct.App.1985), *rev'd on other grounds sub nom. Smialek v. Begay*, 104 N.M. 375, 375, 721 P.2d 1306, 1306 (1986), we held without elaboration that a medical investigator "is not a law enforcement officer." We reaffirm that decision. Plaintiff did not allege in the complaint or argue at the motion hearings that McFeeley holds persons in custody or makes arrests for crimes. She could be a law enforcement officer only if her principal duties could be described as "maintain[ing] public order." Section 41–4–3(D). The Tort Claims Act does not define "maintain public order." But in *Baptiste v. City of Las Cruces*, 115 N.M. 178, 180–81, 848 P.2d 1105, 1107–08 (Ct.App.1993), we said that maintaining public order is essentially the same as handling breaches of the peace. We also stated that the phrase "maintain public order" should be understood as encompassing only duties "traditionally performed by law enforcement officers." *Id.* at 181, 848 P.2d at 1108. The complaint does not allege any duties of McFeeley that could be construed as maintaining public order. Indeed, the only duties of McFeeley mentioned in the complaint are performing autopsies and supervising or training those who do. Consequently, we see no reason to depart from our holding in *Begay*. McFeeley was not a "law enforcement officer" within the definition in the Tort Claims Act.

{25} We next consider the status of Warehime. The complaint does not allege that he was a law enforcement officer but describes him as a crime laboratory technician. He allegedly collected evidence from the scene of Monica Dunn's death and per-

formed tests relating to the firearm that caused her death. Plaintiff does not suggest that Warehime's principal duties included holding persons in custody or making arrests for crimes. In our view, his status cannot be distinguished from that of McFeeley. The duties of both, so far as the complaint suggests, are to examine and evaluate physical evidence that may relate to a possible offense. Ultimately such work helps in maintenance of public order by leading to the apprehension and conviction of the guilty and the exculpation of the innocent. But that connection is too indirect to satisfy the statutory definition. In interpreting the Tort Claims Act our appellate courts have repeatedly found that a connection to law enforcement activity, even being a member of the law-enforcement team, is insufficient by itself to make one a law enforcement officer; the person's duties must directly impact public order. *See. e.g., Montes v. Gallegos*, 812 F.Supp. 1165, 1172 (D.N.M.1992) (mayor not included in definition); *Anchondo v. Corrections Dep't*, 100 N.M. 108, 109–11, 666 P.2d 1255, 1256–58 (1983) (secretary of corrections department and warden of state penitentiary, which does not confine persons *accused* of crime, not included); *Coyazo v. State*, 120 N.M. 47, 49–51, 897 P.2d 234, 236–38 (Ct. App.1995) (district attorney and staff not included); *Dunn v. State ex rel. Taxation & Revenue Dep't*, 116 N.M. 1, 4, 859 P.2d 469, 472 (Ct.App.1993) (director of motor vehicle division not included); *Vigil v. Martinez*, 113 N.M. 714, 720–21, 832 P.2d 405, 411–12 (Ct. App.1992) (probation and parole officers and their supervisors not included); *cf. California First Bank*, 111 N.M. at 68, 801 P.2d at 650 (waiver of immunity does not extend to those "whose conduct concurrently caused the non-immune act of a law enforcement officer."); *Baptiste*, 115 N.M. at 181, 848 P.2d at 1108 (remanding to determine whether animal control officer's duties include maintaining public order). Those who have been found to satisfy the statutory definition have been traditional law enforcement officers and those whose duties are clearly encompassed by the statutory definition. *See Methola v. County of Eddy*, 95 N.M. 329, 332, 622 P.2d 234, 237 (1980) (sheriff, deputies, and jailers); *Abalos v. Bernalillo County Dist. Atty's Office*, 105 N.M. 554, 560, 734 P.2d 794, 800 (Ct.App.1987) (director of a county detention center). Thus, we affirm the district court's dismissal of Plaintiff's claims under the Tort Claims Act against McFeeley, the OMI, Warehime, and the Laboratory.

**V.** *Conclusion*

{26} We reverse the dismissal of the § 1983 claims against McFeeley, Warehime, and Galvan in their individual capacities, and remand to the district court for further proceedings with respect to those claims. We affirm the dismissal of Plaintiff's claims under the Tort Claims Act against McFeeley, Warehime, and their employers.

{27} IT IS SO ORDERED.

DONNELLY and BUSTAMANTE, JJ., concur.

BUSTAMANTE, Judge (concurring).

{28} I concur in Judge Hartz' opinion. I write separately because I am concerned that our case law interpreting Section 41–4–3(B) has unduly narrowed the concept of law enforcement under the Tort Claims Act. Our case law reflects an outdated model of the law enforcement officer as the "cop on the beat." *See Coyazo v. State*, 120 N.M. 47, 49, 897 P.2d 234, 237 (Ct.App.1995). Focussing too narrowly on the activities of commissioned officers on the street creates the risk of missing a large portion of the law enforcement function today. The business of solving and proving crime is increasingly a technical pursuit. Mrs. Dunn's death is a case in point. The decision to arrest and prosecute had little to do with the activities one normally imagines with pursuit and arrest on the street. Rather, it turned largely on the result of a scientific evaluation of technical aspects of the body and the death scene. If a technical investigation is handled recklessly—or is wantonly perverted—an improper prosecution can ensue as surely as if an officer on the street chooses to arrest and prosecute without reasonable suspicion or probable cause. There is no reason why the concept of "law enforcement officer" under the Tort Claims Act should not reach the

technical, investigatory side of the law enforcement house.